JOHN C. KOHLER CO.

v.

The UNITED STATES.

No. 4–73.

United States Court of Claims.

June 19, 1974.

Edwin J. McDermott, Philadelphia, Pa., attorney of record, for plaintiff.

David R. Schlee, Washington, D. C., with whom was Asst. Atty. Gen. Carla A. Hills, for defendant.

Before COWEN, Chief Judge, and SKELTON, and KUNZIG, Judges.

PER CURIAM:

This case comes before the court on defendant's request, filed January 3, 1974, for review by the court of the recommended decision, filed October 18, 1973, by Trial Judge Hal D. Cooper pursuant to Rule 166(c) on plaintiff's motion and defendant's cross-motion for summary judgment. The court has considered the case on the briefs and oral argument of counsel. Since the court agrees with the said decision, as hereinafter set forth, it hereby affirms and adopts the same as the basis for its judgment in this case. Therefore, plaintiff's motion for summary judgment is granted, defendant's cross-motion for summary judgment is denied and the case is remanded pursuant to Pub.L. 92–415, 28 U.S.C. § 1491, and General Order No. 3 of 1972, to the Department of Agriculture Board of Contract Appeals for a determination of the amount plaintiff is entitled to receive for restoring the boiler to an operable condition. Plaintiff's counsel is designated to advise the court, by letter to the clerk, of the status of the remand proceedings as provided for in paragraph 9(a) of the General Order, with said advice to be given at intervals of 90 days or less, commencing from the date of this opinion.

OPINION OF TRIAL JUDGE

COOPER, Trial Judge: Plaintiff contracted to install a boiler for defendant. After plaintiff had installed and tested the boiler, but before final payment to plaintiff had been made, defendant took custody of the boiler and operated it from mid-April to July 18, 1967. On July 18, while the paperwork necessary to conclude the contract was being proc-

essed, the boiler exploded. The question presented in this Wunderlich Act review is as to which of the parties should bear the cost of repairing the boiler.

Although plaintiff contended the explosion was caused by the negligence of defendant's operator, the contracting officer assigned the cause of the explosion to defective equipment and required plaintiff, at plaintiff's expense, to make the repairs necessary to restore the boiler to operating condition. Plaintiff timely appealed the decision of the contracting officer to the Department of Agriculture Board of Contract Appeals (Board). After a full hearing with oral testimony and documentary evidence, the Board concluded that the cause of the explosion could not be determined with reasonable certainty; however, it sustained the decision of the contracting officer, finding that defendant had never accepted the boiler and that plaintiff had failed to discharge its burden of showing that it was not responsible for the explosion.[1]

The matter is before this court on the parties' cross-motions for summary judgment. From a review of the administrative record, and upon consideration of the motions and arguments in support thereof, it is concluded, for the reasons hereinafter stated, that plaintiff's motion should be granted and defendant's cross-motion denied.

## I.

Under contract No. 12–14–100– 8968(73), plaintiff undertook to perform all work required to remove an existing boiler and install a new "package boiler" in one of defendant's buildings. By mid-April 1967, the old boiler had been removed and plaintiff had completed installation and testing of the new boiler. On or about April 15, 1967, defendant assumed custody of the boiler and began regular operation of it with its own personnel. From the commencement of its operation, the boiler functioned without mishap until July 17, 1967, when difficulty was experienced in getting the boiler started. It was the next day, July 18, as defendant's operator commenced the first of the approximately 60 steps necessary to start the boiler, that it exploded.

## II.

The first issue presented in this review is as to the cause of the explosion. The Board found that the explosion could have been caused either by operator negligence or defective equipment but concluded that it was not possible to determine with reasonable certainty which of the two actually caused the explosion. This conclusion by the Board, plaintiff asserts, is not supported by substantial evidence.

The controversy as to the cause of the explosion revolves around a steam atomizing switch that is a part of the boiler controls. During start-up of the boiler, it is necessary to use both a light oil gun and a heavy oil gun. The start-up procedures call for the steam atomizing switch to be placed in a "mechanical" position when the light oil gun is in use. Upon removal of the light oil gun and replacement by the heavy oil gun, the operator must turn the steam atomizing switch from the "mechanical" position to the "steam" position. According to defendant's operator, the explosion occurred within a brief period—10 to 15 seconds—after the light oil gun had been replaced by the heavy oil gun.

Two facts regarding the atomizing switch are not in substantial dispute. The first is that a Mr. White, an employee of plaintiff's subcontractor, investigated the explosion on the morning it occurred and found the atomizing switch in the "mechanical" position rather than in the "steam" position. The other fact is that, during defendant's investigation, it was found that the steam atomizing switch had been wired backwards.

1. John C. Kohler Co., 73–1 BCA ¶ 9771 (1972).

Based on his observation of the atomizing switch, Mr. White's testimony supported the theory that the explosion was caused by the failure of the operator to change the atomizing switch from a "mechanical" to a "steam" position when the light oil gun was replaced by the heavy oil gun. Defendant's expert theorized that the explosion was caused either by operator negligence in failing to turn the atomizing switch or by improper wiring of the atomizing switch.[2]

The operator denied that he had failed to change the steam atomizing switch from the "mechanical" to the "steam" position. His explanation for the switch being in the "mechanical" position was that he turned it back to that position when he was securing the boiler after the explosion had occurred. However, plaintiff introduced evidence that would tend to show that there was no reason to alter the position of the steam atomizing switch after the explosion since this would have no significant effect on the operation of the boiler. This evidence also indicated that it was more desirable to leave the steam atomizing switch in a "steam" position which would have introduced steam to the boiler to smother any fire that may have resulted from the explosion.

The experts for both parties expressed opinions on whether failure to turn the atomizing switch could cause an explosion and whether improper wiring of the switch could result in an explosion. There is testimony supporting the conclusion that, under at least some circumstances, both of the alleged causes could result in an explosion.

From this brief summary of the record, it is apparent that plaintiff is correct in its contention that there is substantial evidence, although largely opinion testimony, that the cause of the explosion was due to operator error. However, there is substantial opinion testimony to the contrary. The difficulty is simply that few measurable, objective facts bearing on the cause of the explosion were available and it was necessary for the witnesses on both sides to theorize as to the cause of the explosion. In view of the operator's denial that he inadvertently left the switch in the "mechanical" position, and in view of the various theories of the experts testifying for each party, the evidence cannot be said to be conclusive in plaintiff's favor.

In such circumstances, the importance of the opportunity which the Board had to observe and judge the demeanor of the witnesses cannot be minimized. The Board apparently believed that both of the two proffered theories provided a reasonable and credible explanation for the explosion. Since the Board gave careful consideration to this issue, and since there is substantial evidence in the record supporting both theories, this court, not having the opportunity to judge the credibility of the witnesses testifying in support of each theory, should not substitute its view of the facts for that of the Board. Wiliamsburg Drapery Co. v. United States, 369 F.2d 729, 733, 177 Ct.Cl. 776, 783 (1966).

Nor does the fact the Board failed to ascertain the cause of the explosion support the conclusion that its decision was either arbitrary or capricious. On review, the test to be applied is whether, on the basis of the evidence before it, the action taken by the Board was a reasonable one. United States v. Carlo Bianchi & Co., 373 U.S. 709, 715, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963); Koppers Co. v. United States, 405 F.2d 554, 186 Ct.Cl. 142 (1968). In view of the nature of the evidence presented on this factual issue, it was not unreasonable for the Board to reach the conclusion that it did. Accordingly, the Board's finding that the cause of the ex-

---

2. Defendant's expert also theorized that the explosion could have been caused by a defective purge valve. However, that theory was rejected by the Board and defendant does not urge it in this review. The record further contains some evidence of oil leakage but the Board did not place any reliance on this evidence.

plosion was of uncertain origin is entitled to finality on this review.

### III.

The remaining issue is the Board's conclusion that defendant had not accepted the boiler prior to its explosion and that, under the terms of the contract, plaintiff had the risk of loss until there was acceptance.

The facts pertinent to this issue are not in dispute. As noted previously, plaintiff's work in installing the boiler was completed by mid-April. Plaintiff then provided instruction in the operation of the boiler for defendant's employees and, thereafter, defendant operated the boiler under its exclusive control up to the time of the explosion, a period of almost 3 months. It was defendant's employee who was operating the boiler at the time of the explosion.

It appears that final payment to the contractor had not been made since some of the paperwork was incomplete. The record contains a letter dated June 2, 1967, in which defendant's superintendent summarized the status of the contract in the following terms:

It appears that you have completed this project except for furnishing payrolls of your painting subcontractor, a small rolling platform ladder and the test reports.

A letter from the contracting officer, dated July 17, 1967, indicates that, as of that date, only paper work involving payrolls remained uncompleted.

The contract contained the usual "responsibility for work" provisions. Under General Provisions, Standard Form 23–A, Section 12, the contractor was to be responsible for all materials and work until the work was accepted by defendant. General Requirement No. 9(b) states that the contractor's responsibility will terminate "when all work has been completed, the final inspection made and the work accepted * * *."

Under General Requirement No. 19, the final inspection was to be made when the contract work was completed and upon written notice by the contractor as to the date on which the inspection was to be made.

Paragraph 1–5 of the specification required plaintiff to instruct defendant's employees on the use of the boiler. This instruction was to occur during the week "after the equipment has been accepted and turned over to the Government for regular operation."

As manifested in these provisions of the contract, the sequence of events contemplated by the parties at the time the contract was made was (1) completion of work on the boiler, (2) notice by plaintiff of readiness for inspection, (3) inspection by defendant, (4) acceptance of the boiler by defendant, (5) turnover of the boiler to defendant for regular operation, and (6) instruction of defendant's employees by plaintiff.

Plaintiff never gave defendant written notice either that the work was completed or that the boiler was ready for inspection. Nor did defendant ever formally advise plaintiff that it had accepted the boiler. Yet, defendant did take possession of the boiler and operate it, and plaintiff did provide the required instruction of defendant's employees, all of which were to occur after acceptance.

Based on these facts, the Board reached the following conclusions: (1) The responsibility for work provisions constituted an express agreement by the parties that plaintiff was to bear the risk of loss up to the time the boiler was accepted by defendant; (2) under the contract, notice by plaintiff that work was completed and ready for inspection, and inspection by defendant, were to precede acceptance; (3) defendant did not waive the notice provision of the contract; (4) the required notice not having been given, and no inspection having been made, defendant could not be said to have accepted the boiler.

■ Neither party disputes the first and second conclusions of the Board.[3] The dispute here centers on the third and fourth conclusions. Since the questions presented involve the legal consequences flowing from defendant's actions in taking possession of the boiler and operating it over a prolonged period, as well as an interpretation of the inspection provisions of the contract, the Board's conclusions on those questions are not binding on the court. Gresham & Co. v. United States, 470 F.2d 542, 200 Ct.Cl. 97 (1972); Paccon, Inc. v. United States, 399 F.2d 162, 169, 185 Ct.Cl. 24, 35 (1968).

As to the contract requirement that plaintiff give defendant written notice when the boiler was installed and ready for inspection, defendant argues that the giving of this notice was an unfulfilled condition precedent to its acceptance of the boiler. Plaintiff urges that defendant, by its actions, waived this notice requirement.

No provision of the contract authorized defendant either to take possession or to operate the boiler prior to the written notification from plaintiff.[4] To the extent the notice was a condition precedent to acceptance of the boiler, it was equally a condition precedent to defendant's possession and operation of the boiler. Yet, defendant did take possession and did operate the boiler for an extended period.

■ From these undisputed facts, it is apparent that this is one of those cases where the absence of strict compliance with the notice requirements of the contract is of no consequence. By placing the boiler in operation, defendant rendered unnecessary a written notice from plaintiff that work on the boiler was complete and that the boiler was ready for inspection. No useful purpose would have been served by plaintiff advising defendant of what defendant was already well aware. In short, the failure of the Government to await a written notice from plaintiff before taking possession of the boiler constituted a waiver of the notice provision of the contract. Penn-Ohio Steel Corp. v. United States, 354 F.2d 254, 173 Ct.Cl. 1064 (1965); Copco Steel & Eng'r Co. v. United States, 341 F.2d 590, 598, 169 Ct.Cl. 601, 616 (1965); cf. Roberts v. United States, 357 F.2d 938, 946, 174 Ct.Cl. 940, 952 (1966). Nor, having waived the notice requirement can defendant now revive it and assert it as an impediment to acceptance of the boiler. Cf. Branch Banking & Trust Co. v. United States, 98 F.Supp. 757, 120 Ct.Cl. 72, cert. denied, 342 U.S. 893, 72 S.Ct. 200, 96 L.Ed. 669 (1951).

Notwithstanding waiver of the notice provision, defendant urges that final inspection of the boiler was also an unfulfilled condition precedent to its acceptance of the boiler.

■■ As the Board noted, there is little in the record concerning the final inspection that was to be made. Although expressly providing for a final inspection, the contract does not prescribe the form the inspection was to take. The only testimony on this subject was that of the contracting officer who testified that a project inspector was to make the final inspection and render a report. However, the contract did not, by its terms, require inspection by the project inspector. The mere fact defendant may have intended the inspection to be conducted in a certain manner and by a certain individual is not controlling, for the subjective, unexpressed intentions of one party are not binding on the other. Firestone Tire & Rubber

3. For the effect of responsibility for work provisions on the risk of loss prior to acceptance of the work, see John McShain, Inc. v. United States, 375 F.2d 829, 179 Ct. Cl. 632 (1967); DeArmas v. United States, 70 F.Supp. 605 108 Ct.Cl. 436 (1947); Mittry v. United States, 73 Ct.Cl. 341 (1931).

4. Under paragraph 1–5 of the specification, defendant's employees were not to be trained until after the boiler had been accepted. This provision is a clear indication that defendant was not to operate the boiler until after notice had been given and the boiler accepted.

Co. v. United States, 444 F.2d 547, 551, 195 Ct.Cl. 21, 30 (1971); Singer-General Precision, Inc. v. United States, 427 F.2d 1187, 1193, 192 Ct.Cl. 435, 446–447 (1970).

What is controlling here is the clear intention of the parties, manifested in the terms of the contract, that defendant was to make its inspection before the boiler was turned over to defendant for regular operation. Since the substance of the inspection was not specified in the contract, defendant had substantial discretion to make such reasonable inspection as it deemed appropriate. However, that discretion was to be exercised before defendant took possession of the boiler. It is insufficient, on the issue of whether a final inspection was made, for defendant to show that, long after it placed the boiler in operation, it intended to have a project inspector make an inspection. Since the inspection was defendant's responsibility, and since defendant did take possession of the boiler and place it in operation, defendant is in no position to complain that it did not make a final inspection.

There is nothing in the contract that would suggest that the final inspection was to consist of anything more than a visual inspection of the boiler to ensure it was of the type specified in the contract and that it was operational.[5] By its actions in taking possession of the boiler, defendant clearly manifested its satisfaction that the boiler was of the type for which it had contracted. The operability of the boiler was obviously demonstrated to defendant when plaintiff provided training for defendant's employees. Defendant's actions in thereafter operating the boiler far beyond any trial period make it plain that defendant was satisfied that the boiler was operational.

It is the substance of these actions, although they may not have borne the label of a final inspection, that demonstrate that defendant made such inspection as it deemed necessary before placing the boiler in operation. Had it wanted to conduct a more comprehensive inspection, it had more than ample opportunity to do so. Instead, and for whatever reason, defendant elected to place the boiler in operation. In so doing, defendant thereby waived whatever additional inspections it may have wanted to make before accepting the boiler.

Defendant urges that 41 C.F.R. § 1–14.101(a) precludes finding a waiver of the inspection. While that regulation does require an inspection in all cases prior to acceptance, there is nothing in the regulation specifying the type or scope of inspection to be conducted. Indeed, subsection (b) of the same regulation permits substantial discretion as to the type of inspection conducted, providing that "the type and extent of inspection needed depend on the particular procurement." It may amount to nothing more than a check "for identity, quantity and shipping damage." 41 C.F.R. § 1–14.101(b). In this case, it can hardly be disputed that, by taking possession and operating the boiler, defendant necessarily checked the boiler for identity, quantity and absence of shipping damage. Whether a more comprehensive inspection was to be conducted rested within the discretion of the contracting officer; it was not mandated by the regulation.

There remains the question of whether defendant accepted the boiler. Under General Requirements No. 9(b), the boiler was to be accepted "by the Head of the Department or his authorized representative." The contract is otherwise silent as to the form the acceptance was to take, although plaintiff was to be given a release, presumably in written form. The record is also silent as to who authorized taking possession of the

---

5. Under paragraph 1–6 of the specification, actual testing of the boiler to demonstrate conformance with the specification was to be performed by plaintiff. The Board found that plaintiff had performed the tests.

boiler and placing it in operation. However, defendant makes no contention that its use of the boiler was the result of unauthorized acts by its employees. Accordingly, the question is simply whether defendant's acts of taking possession and operating the boiler constitute an acceptance of the boiler.

The Uniform Commercial Code, § 2–606(1)(c), declares that acceptance of goods occurs when the buyer does any act inconsistent with the seller's ownership.[6] The most common act which falls under this provision is the retention and use of the goods by the buyer. See, e. g., Green Chevrolet Co. v. Kemp, 241 Ark. 62, 406 S.W.2d 142 (1966). Marbelite Co. v. City of Philadelphia, 208 Pa.Super. 256, 222 A.2d 443 (1966); F. W. Lang Co. v. Fleet, 193 Pa.Super. 365, 165 A.2d 258 (1960).

Here, defendant's custody of the boiler, its operation of the boiler for its own purposes for over 80 days, its selection of the employees to operate the boiler, its control over when the boiler was operated and for what periods, its determination of the load the boiler was to carry, and the selection of fuel, air and steam ratios to use, are among the factors present here which are inconsistent with ownership by plaintiff. Conversely, the record is barren of any evidence that plaintiff, during the period from mid-April to July 18, had any control over the boiler, or the employees operating it. So far as the record indicates, plaintiff's only interest in the boiler was in concluding the necessary paperwork so that it would receive payment for the work theretofore completed.

In these circumstances, and as a consequence of its custody and operation of the boiler over a prolonged period,[7] defendant must be deemed to have impliedly accepted the boiler.[8]

The boiler having been accepted by defendant, and the cause of the explosion not having been found to be the fault of plaintiff, it follows that defendant must bear the loss resulting from the explosion. Accordingly, plaintiff is entitled to recover the costs incurred in complying with the contracting officer's directive to restore the boiler to operating condition.

## CONCLUSION

Plaintiff's motion for summary judgment is granted and defendant's cross-motion is denied. The case is remanded to the Board for a determination of the amount plaintiff is entitled to receive for restoring the boiler to an operable condition.

6. The Uniform Commercial Code is applicable to the field of public contracts. Harry Thuresson, Inc. v. United States, 453 F.2d 1278, 197 Ct.Cl. 88 (1972); Northern Helex Co. v. United States, 455 F.2d 546, 197 Ct. Cl. 118 (1972); Everett Plywood & Door Corp. v. United States, 419 F.2d 425, 430, 190 Ct.Cl. 80, 89 (1969).

7. For board decisions in the field of public contracts holding that retention and use by the Government will be deemed an acceptance, see Silent Hoist & Crane Co., 1964 BCA ¶ 4488; Flight Test Eng'r Co., 1962 BCA ¶ 3606; Waterbury Companies, Inc., 61–2 BCA ¶ 3158.

8. Defendant's reliance on § 2–510(1) of the Uniform Commercial Code is misplaced. The Board's factual findings that the boiler exploded from indeterminate causes precludes an argument that the boiler failed to conform to the contract. Moreover, defendant's lengthy operation of the boiler undercuts any argument that the boiler was so nonconforming as to give a right of rejection. If it had a right of rejection, it failed timely to exercise that right. Cf. Max Bauer Meat Packer, Inc. v. United States, 458 F.2d 88, 198 Ct.Cl. 97 (1972).